CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

September 23, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| WESLEY REX JONES, | ) | |
| Plaintiff, | ) | Civil Action No. 7:21-cv-00541 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| SHELBY HARRELL et al., | ) | By: Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |

Plaintiff Wesley Rex Jones is suing Defendants Shelby Harrell and Heather Boyd for violating his First Amendment right to receive commercial photographs while incarcerated, 42 U.S.C. § 1983. *See* Compl. 3–7 (Count I), ECF No. 1; Order of Mar. 22, 2024, at 2, ECF No. 33. Jones alleges that Harrell and Boyd required him to comply with a vague and overly broad Individualized Rehabilitation Plan ("IRP") that prohibits him from accessing visual materials that depict males in certain ways and then used this IRP to confiscate hundreds of photographs and thumbnail prints depicting "men in . . . seductive pose[s]" that Jones had ordered from a Virginia Department of Corrections ("VDOC") approved vendor, Compl. 4. *See generally id.* at 3–7; Mem. Op. of Mar. 22, 2024, at 2, 9–10, 27–38, ECF No. 32. He seeks damages from each Defendant in her personal capacity as well as an order directing that the images be returned to him and that his IRP "be rewritten so it is specific to the elements and nature of [his] crime." *See* Compl. 12. Defendants filed a supplemental motion for summary judgment on Count I of Jones's verified Complaint.[1] Defs.' Suppl. Mot., ECF No. 50; *see* Order of Mar. 22, 2024, at 2. Their motion is fully briefed, ECF Nos. 51, 68, and can be decided without a hearing, Fed. R. Civ. P. 78(b), W.D. Va. Civ. R. 11(b).

---

[1] I previously dismissed Jones's § 1983 claim alleging that Harrell and Boyd discriminated against him on the basis of his sexual orientation in violation of the Equal Protection Clause (Count II). *See* Mem. Op. of Mar. 22, 2024, at 2, 11, 28–34. Only Count I remains. *Id.* at 2.

## I. The Legal Framework

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 521–22 (4th Cir. 2003). "A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "*genuine* issue of *material* fact" exists when proffered evidence that would be admissible at trial, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party" on a disputed "fact[] that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

"[T]he party seeking summary judgment bears [the] initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat*, 346 F.3d at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see* Fed. R. Civ. P. 56(c), (e). When, as here, the defendant moves for summary judgment on the plaintiff's claim against it, the defendant need only "point[] out . . . that there is an absence of [admissible] evidence to support" an essential element of that claim. *Celotex Corp.*, 477 U.S. at 325; *see* Fed. R. Civ. P. 56(a), (c)(1)(B). It may also "cit[e] to particular parts of materials in the record" to show that a "fact cannot be . . . genuinely disputed." Fed. R. Civ. P. 56(c)(1)(A). Once the defendant meets this burden, the plaintiff "must come forward and demonstrate" that a genuine dispute over a material fact "does, in fact, exist."[2]

---

[2] "As a general rule," the plaintiff "cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the [defendant's] motion." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021); *see* Fed. R. Civ. P. 56(c)(1), (e). "However, it is well established that a *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the [factual] allegations

*Bouchat*, 346 F.3d at 522 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). If the plaintiff "fails to properly address" the defendant's "assertion of fact as required by Rule 56(c)(1), the court may[] consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

*

 In Count I, Jones alleges that his IRP is unconstitutionally vague and overboard, both as Boyd drafted it and as Harrell applied it to justify confiscating hundreds of commercial images of young men in seductive poses. *See* Compl. 3–7; Mem. Op. of Mar. 22, 2024, at 9–10. This Count asserts a claim that Boyd and Harrell violated Jones's First Amendment right to free speech—specifically his right to view and possess otherwise lawful publications—while incarcerated. Mem. Op. of Mar. 22, 2024, at 9–10 (citing *Couch v. Jabe*, 737 F. Supp. 2d 561, 564–73 (W.D. Va. 2010); *Ballance v. Virginia*, 130 F. Supp. 2d 754, 758–60 (W.D. Va. 2010)).

The Supreme Court has long held that "imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those in the First Amendment." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality op.) (discussing *Turner v. Safley*, 482 U.S. 78 (1987)). But, "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). In the First Amendment context, regulations (or other state actions) that restrict prisoners' rights "are permissible if they are 'reasonably related to legitimate penological interests' and are not an 'exaggerated response' to such objectives." *Beard*, 548 U.S. at 528

---

contained therein are based on [the plaintiff's] personal knowledge." *Goodman*, 986 F.3d at 498 (internal quotation marks omitted); *see* Fed. R. Civ. P. 56(c)(4) "A complaint is verified if it is signed, sworn, and submitted under penalty of perjury." *Goodman*, 986 F.3d at 495 n.2 (internal quotation marks omitted).

(quoting *Turner*, 482 U.S. at 87) (internal citation omitted); *see, e.g., Fauconier v. Clarke*, 257 F. Supp. 3d 746, 754–55 (W.D. Va. 2017) (First Amendment facial challenge to VDOC regulation); *Ballance*, 130 F. Supp. 2d at 756–60 (First Amendment claim challenging officer's decision to confiscate 406 photos of children from prisoner's cell).

    *Turner* sets out "four factors 'relevant [to] determining the reasonableness of the regulation at issue.'" *Beard*, 548 U.S. at 529 (quoting *Turner*, 482 U.S. at 89). "First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it?" *Id.* (quotation marks omitted). Second, does the prisoner have "alternative means of exercising the right" at issue? *Id.* (quotation marks omitted). Third, what impact will it have on guards, other prisoners, and "the allocation of prison resources generally" if the court invalidates the regulation? *See id.* (quotation marks omitted). Fourth, does "the presence of ready alternatives undermine[] the reasonableness of the regulation[]"? *Overton v. Bazzetta*, 539 U.S. 126, 136 (2003); *see also Beard*, 548 U.S. at 529 (citing *Turner*, 482 U.S. at 90); *Prison Legal News v. Stolle*, 319 F. Supp. 3d 830, 836 (E.D. Va. 2015) (citing *Beard*, 548 U.S. at 535). Courts applying the *Turner* factors "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. "The burden, moreover, is not on the [defendant] to prove the validity of prison regulations but on the prisoner to disprove it." *Id*.

    A court resolving a defendant's motion for summary judgment against a prisoner's claim alleging a First Amendment violation "must draw all justifiable inferences in [the prisoner's] favor" as the nonmoving party. *Beard*, 548 U.S. at 529 (internal quotation marks omitted). "In doing so, however, [it] must distinguish between evidence of disputed facts and disputed matters

of professional judgment. In respect to the latter, [its] inferences must accord deference to the views of prison authorities." *Id.* at 530 (citing *Overton*, 539 U.S. at 135–36); *see, e.g.*, *Ballance*, 130 F. Supp. 2d at 759–58 (explaining that the court would "not undermine the seasoned judgment" of corrections officer who seized 406 photos of children from prisoner based on prisoner's known status as a "convicted pedophile"). "Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard*, 548 U.S. at 529; *see id.* at 529, 534–35 (describing prisoner's burden to rebut defendant's properly supported motion for summary judgment, Fed. R. Civ. P. 56(e)).

## II. Background[3]

In 1999, Jones was convicted on multiple counts of forcible sodomy, aggravated sexual battery, and taking indecent liberties with a child. Defs.' Br. in Supp. ¶ 3 (citing Stransky Aff. ¶ 4). He committed those crimes "against underage male victims." Harrell Aff. ¶ 12. Jones "is a registered Tier III sex offender" based on his convictions for "one or more violent sexual offenses." Defs.' Br. in Supp. ¶ 4 (citing Stransky Aff. ¶ 5). He is serving 116 years in VDOC custody, Stransky Aff. ¶ 4, and will not be eligible for good-time release ("GTR") until 2099, Boyd Aff. Encl. A, ECF No. 51-4, at 13 ("His GTRD is 2099."). *See* Defs.' Br. in Supp. ¶ 3

---

[3] The facts set out below are undisputed. Defs.' Br. in Supp. ¶¶ 1–38 (Statement of Undisputed Facts); *see* Fed. R. Civ. P. 56(c)(1), (e)(2). They come from Jones's verified complaint, ECF No. 1; the Statement of Undisputed Facts in Defendants' brief, Defs.' Br. in Supp. ¶¶ 1–4, 10–38, which Jones did not contest, *see* Pl.'s Br. in Opp'n 1–4, ECF No. 68; and affidavits and other documents that Defendants submitted with this motion, *e.g.*, Aff. of Heather Boyd, M.S. (June 3, 2022) ("Boyd Aff."), ECF No. 51-4; Aff. of Shelby Harrell, M.Ed. (June 2, 2022) ("Harrell Aff."), ECF No. 51-5; Suppl. Aff. of Shelby Harrell, M.Ed. (July 3, 2024) ("Harrell Suppl. Aff."), ECF No. 52; Suppl. Aff. of Heather Boyd, M.S. (July 3, 2024) ("Boyd Suppl. Aff."), ECF No. 54; Aff. of Maria Stransky (July 3, 2024) ("Stransky Aff."), ECF No. 55. Jones's pro se brief opposing Defendants' motion, ECF No. 68, is not verified. Thus, even if Jones contested any of Defendants' undisputed facts, he could not rely on this brief to demonstrate the existence of a genuinely disputed material fact. *See Jeffries v. UNC Reg'l Physicians Pediatrics*, 392 F. Supp. 3d 620, 626 (M.D.N.C. 2019) (citing *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004)).

(citing Stransky Aff. ¶ 4). Between August 2019 and May 2022, Jones was housed at Green Rock Correctional Center ("GRCC") in Chatham, Virginia. Compl. 1.

*

Jones's remaining § 1983 claim alleges that Harrell and Boyd infringed his First Amendment right to receive commercial photographs in the spring of 2021. *See id.* at 3–7; Mem. Op. of Mar. 22, 2024, at 2, 9–10, 27–38. VDOC policy in effect at that time generally allowed inmates to order/possess images or other visual depictions from vendors.[4] *See generally* Harrell Suppl. Aff. Encl. C, Va. Dep't of Corrs., OP 803.2, *Incoming Publications* (eff. Apr. 1, 2021), ECF No. 51-4, at 24–36. But some exclusions applied:

> To maintain security, discipline, and good order in [V]DOC institutions and assist with inmate rehabilitation and treatment, reduce sexual harassment, and prevent a hostile environment for inmates, staff, and volunteers, *inmates are not permitted* to send, receive, or possess material that *emphasizes explicit or graphic depictions . . . of sexual acts or contains nudity as defined* in this operating procedure.

OP 803.2 § I(B)(2) (emphasis added). OP 803.2 defined "Nudity" as the "showing (human or cartoon) of the male or female genitals, pubic area, . . . or male or female buttocks with less than a full opaque covering of the anus." *Id.* (definitions). "Semi-nude photographs" were generally permitted under OP 803.2. *See Tory*, 2024 WL 3331668, at *3.

Additionally, inmates could order and possess a publication sent directly from any vendor "so long as" the publication does not:

> 1. Pose a threat to the security, discipline, and good order of the institution and is not detrimental to inmate rehabilitation

---

[4] VDOC policy "distinguishes between personal photographs/pictures and commercially distributed photographs." *Tory v. Davis*, No. 7:18cv393, 2024 WL 3331668, at *3 (W.D. Va. July 8, 2024) (comparing VDOC OP 803.1, *Offender Correspondence*, with VDOC OP 803.2, *Incoming Publications*). "Commercially distributed photographs are treated as publications" and are subject to "less restrictive" rules than personal photographs. *Id.* (noting that OP 803.2 generally permits possession of "commercially distributed semi-nude photographs," whereas OP 803.1 bans all possession of "semi-nude personal photographs"). Jones's First Amendment claim concerns commercially distributed photographs only.

2. Promote violence, disorder, or the violation of state or federal law

3. Contain nudity or any sexually explicit content or sexual acts in violation of state or federal law to include child pornography.

4. Violate any of the *Specific Criteria for Publication Disapproval*

OP 803.2 § I(C)(1)–(4) (punctuation and emphasis in original). As most relevant here, the fourth category disallowed any publication that "can be reasonably documented to violate" either of these criteria:

> B. Material that . . . promotes activities that are in violation of state or federal law including the abuse or sexual exploitation of children or contains nude depictions of children in the context of sexual activity [or]
>
> E. Material whose content could be detrimental to the inmate [sic] rehabilitation efforts or the safety or health of inmates, staff, or others based on the inmate's specific criminogenic needs[.]

*Id.* § VIII(B), (E). Criterion E "require[d] staff to disapprove publications and other materials when the publication is determined to be detrimental to inmate rehabilitative efforts . . . . based on assessment of the inmate's specific criminogenic factors." *Id.* § IX(A)–(B). Only "Program, Mental Health, or other appropriate staff" outside the mailroom were authorized to "determine when a publication is detrimental to inmate rehabilitative efforts." *See id.* § IX(C) ("[M]ailroom staff should not be making this determination without inmate-specific guidance and review from Program, Mental Health, or other appropriate institution staff."). If the inmate disagreed with the decision to disallow a publication, then he or she could appeal that decision though the Offender Grievance Process. *See* Harrell Suppl. Aff. ¶ 10; OP 803.2 § VII(A)–(C).

Additionally, qualified VDOC staff could restrict an inmate's access to publications by implementing an IRP. *See* Stransky Aff. ¶¶ 12, 14–15; Defs.' Br. in Supp. ¶ 17 (citing Boyd Suppl. Aff. ¶ 9). These "restrictions are generally greater than those on the general inmate population." Boyd Suppl. Aff. ¶ 9. But, they are also "specific to one inmate, and they are based upon an assessment of many factors unique to that individual, including his underlying crimes,

the materials that may have been found in his possession, his statements, and other information relative to his personal history and incarceration." Defs.' Br. in Supp. ¶ 18 (citing Boyd Suppl. Aff. ¶ 9). In May 2021, VDOC policy authorized qualified staff to implement IRPs for "[s]ex offenders who demonstrate problematic sex-related behaviors during incarceration . . . even if they are not actively involved in sex offender treatment." Stransky Aff. ¶ 10 (citing Stransky Aff. Encl. A, Va. Dep't of Corrs., OP 735.2 *Sex Offender Treatment Services (Institutions)* (eff. May 1, 2021), ECF No. 51-1, at 6–15). "Gathering and possessing sexually explicit or suggestive materials is problematic" for individuals convicted of sex crimes because suppressing "sexual urges can be especially difficult for sex offenders." *Id.* ¶ 12. "Viewing sexually explicit or suggestive materials tends to rouse sexual urges . . . in these individuals. Disallowing possession of sexually explicit or suggestive images is therefore an important part of an [IRP] for these inmates." *Id.* Restricting these inmates' access to such images also reduces the risk that "sexual excitement" in a prison setting will "manifest as sexual harassment and inappropriate actions towards staff and other inmates." *Id.* ¶ 13. Inmates with IRPs "retain the ability to access publications that are not contrary to their rehabilitation goals." *Id.* ¶ 14.

**

Defendant Shelby Harrell was a Psychology Associate I at GRCC in the spring of 2021. *See* Harrell Aff. ¶¶ 1, 6. Her "job duties include[d] ensuring that sex offenders housed" there received "appropriate treatment" and teaching "inmates to self-monitor their behaviors and to be able to correct any issues to prevent [him or her] from re-offending upon release." *Id.* ¶ 4. Jones had a sex-offender "treatment plan when he was at GR[C]C." *Id.* ¶ 13. "[A]s part of his treatment plan," Harrell had "authority to review his property (documents, photos, etc.) while he was

8

[t]here to ensure that he was not participating in any behaviors related to the offenses for which he is incarcerated." *Id.*

In April 2021, the GRCC "mailroom sent [Harrell] photos and catalogue pages that Jones had ordered from Pineapple Express because of the young age of the males depicted." *Id.* ¶ 6; *see* Defs.' Br. in Supp. ¶ 20 (citing Harrell Aff. ¶ 6); Harrell Suppl. Aff. ¶ 3 ("[I]n April 2021, I was notified by the mailroom that inmate Jones had received sexually explicit materials that might not be appropriate for offender possession."). Given "the nature of these materials" and Jones's known status as a sex offender, Harrell contacted Defendant Heather Boyd so Boyd could assess the images and determine if it was "appropriate" for Jones "to possess [them] while in custody." Harrell Suppl. Aff. ¶ 3; *see* Boyd Suppl. Aff. ¶ 6.

Boyd was a Certified Sex Offender Treatment Provider with VDOC's regional Sex Offenders Services at the time. Boyd Aff. ¶ 1. Her "job duties include[d] ensuring that sex offenders housed in facilities in the Western Region are getting treatment at their assigned facility or that they are sent to a facility where they can receive more intensive treatment two to three years in advance of their release dates."[5] Boyd Suppl. Aff. ¶ 4. As part of Jones's "treatment plan, [Boyd] ha[d] the authority to review his property . . . to ensure that he is not participating in offense related behavior." Boyd Aff. ¶ 7. In April 2021, Boyd asked Harrell to send her the materials addressed to Jones, which Harrell did. *Id.* ¶ 8. They included 57 catalogue

---

[5] "Inmates more than five years until their release date will not be placed in sex offender treatment." OP 735.2 § VII(A)(2). However, "[i]nmates demonstrating problematic sex-related behaviors during incarceration (e.g., excessive sex-related infractions, gathering/possessing viewing materials for use as deviant sexual stimuli) may be considered for intervention with the approval of the Sex Offender Program Director." *Id.* § XI; *see* Stransky Aff. ¶ 10 (citing OP 735.2 § XI). "These inmates may be placed on an Individual Rehabilitation Plan." Stransky Aff. ¶ 10 (citing OP 735.2 § XI). IRPs "are intended to fulfill treatment and rehabilitation purposes, reducing the risk of recidivism and preventing relapse into sexually deviant behaviors." *Id.* ¶ 11.

pages and "50 plus commercial photos." *Id.* Boyd reviewed them and researched Jones's

criminal history. *Id.*; *see* Defs.' Br. in Supp. ¶ 21.

On April 19, Harrell told corrections officers to seize Jones's "personal papers, including

books, magazines, and photos" from his cell so she could review them. Compl. 3; *see* Boyd Aff.

¶ 9. Jones got some of his papers back the next day. *See* Compl. 3. But, Harrell held on to 119

commercial photos and 57 pages of thumbnail prints (collectively, the "images") that Jones used

to order photos from the vendor.[6] *See* Compl. 3; Harrell Suppl. Aff. ¶ 6. On April 21, Jones

asked Harrell to return the images because, in his view, they did not violate Virginia law or

VDOC policy.[7] Compl. 3 (citing Compl. Ex., ECF No. 1-1, at 26). Harrell responded that they

would meet to discuss all the items seized from Jones's cell. *Id.*

Jones attests that the images depict men who are at least 18 years old. *See id.* at 4–7, 10.

He knows this because he "purchased [the] photos from a vendor who assured [him] that the

primary subjects in the photos are 18 years old or older." *Id.* at 5; *see also id.* at 10. The vendor

also sent an age disclaimer with each order. *Id.* at 5 (citing Compl. Ex., ECF No. 1-1, at 17 ("All

models are 18 years of age or older per 18 USC 2257.")). Jones believes that "[n]one of [his]

photos had nude men or men engaged in sexual acts as defined by [VDOC] Operating Procedure.

Although some had men together touching or kissing there were none touching the genitals of

---

[6] Defendants produced *ex parte* full-sized color photocopies of all 119 photos and 57 pages of thumbnail images for *in camera* review. Harrell Suppl. Aff. ¶¶ 6–7; Harrell Suppl. Aff. Encl. B (Sealed), ECF No. 51-3, at 5. Defendants assert (and Jones does not dispute) that the "confiscated photographs all depict boys or young men in varying states of undress, some with exposed pubic hair or buttocks, and generally posed in a sexually suggestive manner." Defs.' Br. in Supp. ¶ 38 (citing Harrell Suppl. Aff. Encl. B).

[7] Harrell also determined that a few other "items were contraband—i.e., not allowed to be possessed by any inmate because they were against VDOC policy." Harrell Suppl. Aff. ¶ 5. Jones's remaining § 1983 claim concerns the "57 catalogue pages showing semi-nude and sexually explicit photographs [and the] 119 commercial photographs" that Harrell later determined "did not comply with the terms of Jones'[s] IRP," Harrell Suppl. Aff. ¶ 6. *See generally* Compl. 3–5 (discussing the same). The contraband items are not at issue.

another." *Id.* Of the 119 larger photos, Jones thinks "maybe nine" of them depict men who look

like "a young 18." *Id.* at 5. The rest depict "men who look[] older than 18." *Id.* The men depicted

in the thumbnail images were "vetted by the vendor to ensure they are 18 years of age and

older."[8] *Id.* at 6.

Jones, Harrell, and Boyd met on May 11, 2021. Compl. 3–4; Boyd Aff. ¶ 12; Harrell Aff.

¶ 9. Boyd examined Jones's image collection in person before this meeting. Defs.' Br. in Supp.

¶¶ 22–23; Boyd Aff. ¶¶ 9–11. She "found over 50 plus commercial photos (nude and seminude)

of individuals who appeared to be minor males." Boyd Aff. ¶ 11. She also "reviewed a plethora

of thumbnails from Pineapple Express; a handwritten order list; [and] a commercial photo of two

individuals who appeared to minor males engaging in a sexual act." *Id.* (footnote omitted).

"Based on the information [she] had reviewed regarding Jones and his criminal history, [Boyd]

was concerned about the volume and content of these sexually explicit materials." Boyd Suppl.

Aff. ¶ 8; *see* Defs.' Br. in Supp. ¶ 24 (citing Boyd Suppl. Aff. ¶ 8).

Boyd "took the lead" interviewing Jones on May 11. Harrell Aff. ¶ 9. Harrell was there

with Jones in person; she observed this interview because she was still learning the process. *Id.*

Boyd first asked Jones about his convictions for indecent liberties, forcible sodomy, and

aggravated sexual battery. According to Boyd's contemporaneous Mental Health Services

Progress Notes, Jones "stated, 'Nothing happened. These people lived in my mom's trailer park.

A woman thought I was going to marry her but I was not. Her nephew accused me out of the

---

[8] Jones had hundreds of thumbnail images depicting "sensual Asian men," "exotic mysterious black men," semi-nude models where "you would see it all" if a "towel or hand wasn't in the way," and "Twink," or "[y]oung skinny smooth guys all over the age of 18." *See* Compl. Attach. 1, ECF No. 1-1, at 18; *accord* Defs.' Br. in Supp. ¶ 37 n.3 ("'Twink' is a slang term generally referring to a young, thin, homosexual male, with little or no body hair, in his late teens or early 20s."). He "had more Twink than others." Compl. Attach. 1, ECF No. 1-1, at 18; *accord* Harrell Suppl. Aff. Encl. B (Twink vols. 2, 4, 6–8, 10). Jones does not dispute that these images depict semi-nude post-pubescent boys or young men in sexually seductive poses. *See* Defs.' Br. in Supp. ¶ 38 (citing Harrell Suppl. Aff. Encl. B).

blue.'" Boyd Aff. Encl. A (May 11, 2021), ECF No. 51-4, at 13. "After prompting, . . . Jones reported, 'I lived in the trailer park to [*sic*] but not with my mom. They said there were four victims all together (males, ages 14, 13, 13, and 8).' After further prompting, . . . Jones stated, 'Nothing happened!'" *Id.* Jones does not dispute that he made the quoted statements. Pl.'s Br. Opp'n 1–5; *see Beard*, 548 U.S. at 527.

Boyd asked Jones why he had "so many photos" and why he was "ordering the photos." Boyd Aff. Encl. A, ECF No. 51-4, at 13. According to Boyd's interview notes, Jones "stated, 'I saw a flier and a row of pictures. I questioned one of the photos about the age of the model and wrote to Pineapple Express to verify that all the models were over 18. Then I placed an order.'" *Id.*; *accord* Compl. 5. "After prompting," Jones added, "'[a]nother inmate gave me about 5–6 photos who looked underage. I didn't order those. I just put them in a photo album.'" Boyd Aff. Encl. A, ECF No. 51-4, at 13. Boyd asked Jones why he had these particular kinds of photos. *See id.*; Compl. 4. Jones attests he told Harrell and Boyd that he is "bi-sexual and used the photos as a means of escape, mentally, from prison." Compl. 4. He also "argued that these photos had nothing to do with [his] crimes." *Id.* According to Boyd's interview notes,

> Jones stated, "People get uncomfortable looking at the human form. When you have these photos in prison, there is no conflict like getting caught looking at other men." After prompting, . . . Jones reported, "I like to fantasize about who they were and what they were like. I like to profile them. *The purpose is for sexual fantasies*. It's a luxury I allow myself to have from time to time."

Boyd Aff. Encl. A, ECF No. 51-4, at 13 (emphasis added). Jones does not dispute that he said the photos were "for sexual fantasies," Defs.' Br. in Supp. ¶ 23 (quoting Boyd Aff. ¶ 15), Stransky Aff. ¶¶ 17–18. *See generally* Pl.'s Br. in Opp'n 1–5; Fed. R. Civ. P. 56(e)(2). After the interview, Boyd opined that "Jones appear[ed] to possess offense related thoughts and behaviors." Boyd Aff. Encl. A, ECF No. 51-4, at 12.

In Boyd's "experience, sex offenders who are preoccupied with viewing, or who frequently collect or possess images that they find arousing or reminiscent of their criminal behavior are less likely to succeed in rehabilitation. Jones's attempts to collect images/photos indicates to [Boyd] that he is . . . hyper-focused on collecting and possessing images that are not conducive to sex offender treatment." Boyd Aff. ¶ 29. These "images do not necessarily have to be what is typically considered 'pornographic' or 'sexually arousing.'" *Id.* ¶ 30. For "inmates who have offended against minors, like Jones, the collection and possession of seemingly innocent pictures of children . . . tend to indicate unhealthy thoughts and behaviors and an unwillingness to adapt their sexual impulses into more healthy, socially acceptable, and lawful behaviors." *Id.* "Based on [her] review of the materials, Jones's criminal history and the evaluation process," including her "interview with him," Boyd "determined that an Individualized Rehabilitation Plan ('IRP') would need to be implemented" for Jones. *Id.* ¶ 12. Boyd drafted the IRP. *Id.*

***

Jones's IRP prohibits him "from viewing or possessing any publications, materials, drawings, or photos which may be detrimental to his Individualized Rehabilitation Plan (IRP), or which may or could promote sexually deviant behaviors, per O.P. 803.2." Stransky Aff. Encl. B, *Individualized Rehab. Plan* (May 11, 2021), ECF No. 51-1, at 16 (citing *see* OP 803.2 § I(C)(3)–(4)). In Jones's case,

> [t]his includes, but is not limited to, viewing and possessing materials (including drawings) of *any male who appears to be under the age of 18, or is purposefully attempting to appear to be under the age of 18,* as well as all photographs, or drawings, that violate VA DOC policy (i.e., nude or any pornographic materials). *Additionally*, Mr. Jones may not view or possess materials *featuring males touching themselves or each other in a manner that is perceived as sexual in nature,* including, but not limited to, touching the genital area, breasts, or buttock of themselves or others.

*Id.* (emphasis added) (citing OP 803.2 § I(B)(2)). The IRP's purpose "is to offer good faith efforts to promote its efficacy" while Jones is in VDOC custody. *Id.* It is Jones's "responsibility to contact the Psychology Associate . . . regarding any known or questionable materials, drawings, photos, or publications that he may receive in the future[] or at any time may have in his possession." *Id.* The Psychology Associate will monitor Jones's compliance with the IRP and address any violations with him directly. *Id.* (noting that such violations "can result in an institutional infraction for Possession of Contraband"). "Any materials found to violate this IRP, or [VDOC] policy, will result in a [] Possession of Contraband change and will be confiscated." *Id.* at 17.

Boyd chose the IRP's "provisions and prohibitions . . . based on [her] clinical and professional judgment regarding Jones's rehabilitative needs." Boyd Aff. ¶ 32. For example, the IRP refers to "males" because the only "offense-related" materials that GRCC staff found in Jones's mail and/or cell depicted "underage males or those appearing to be underage." Boyd Suppl. Aff. ¶ 20. Similarly, the IRP prohibits Jones from accessing "publications of males acting in a sexual manner" because he committed sex crimes "against underage male victims." *See* Harrell Aff. ¶ 12. Maria Stransky, Director of VDOC's Sex Offender Programs, attests that these prohibitions are "appropriate from a rehabilitative perspective." Stransky Aff. ¶ 18. In her judgment, "[t]he accumulation of over 100 sexually explicit images by a convicted violent sex offender—who admittedly was using them to gratify his sexual fantasies—is contrary to the overall goal of monitoring and reducing risk in convicted sex offenders. This is true regardless of whether the individuals depicted in the suggestive photographs are under the age of 18, or are adults." *Id.* Boyd and Harrell told Jones that he could still order photos, but they encouraged him "to be mindful of appearances" when doing so. Boyd Aff. Encl. A, ECF No. 51-4, at 12. Jones's

14

decision not to order photos of models who "looked underage" showed that he could "question" whether images would violate his new IRP. *See id.*

Jones, Harrell, and Boyd signed the IRP on May 11, 2021. *See* Defs.' Br. in Supp. ¶ 33. Harrell then reviewed the 119 commercial photos and 57 pages of "semi-nude and sexually explicit" thumbnail images to determine if they violated Jones's new IRP. Harrell Suppl. Aff. ¶¶ 6–8. In doing so, she was "guided by the express language and terms of the IRP." *Id.* ¶ 8. Jones argued that at least 100 photos could be returned to him "according to the plan's criteria," but Harrell disagreed. *See* Compl. 4. She confiscated his entire collection of photos and thumbnail pages. *See* Harrell Suppl. Aff. ¶¶ 6–7; Compl. 5, 8. These images "all depict boys or young men in varying states of undress, some with exposed pubic hair or buttocks, and generally posed in a sexually seductive manner." Defs.' Br. in Supp. ¶ 38 (citing Harrell Suppl. Aff. Encl. B).

On May 14, Jones sent Harrell a request explaining his position that certain photos and thumbnail volumes complied with the terms of his IRP and, as such, there was no reason why he should not be allowed to have them. *See* Compl. Ex., ECF No. 1-1, at 19. He "underst[oo]d" that he could not "have most of the Twink volumes." *Id.* But, he argued that he should be allowed to have the "erotic, semi-nude, Asian, and black volumes" because none of those images depicted "anyone who looks too young." *Id.* On May 25, Harrell responded that the collection had been "reviewed and is still disapproved." *See* Compl. Ex, ECF No. 1-1, at 1. Jones then appealed Harrell's decision through the Offender Grievance Process. *See* Compl. 8–9. In August, VDOC's Chief of Health Services Operations found Jones's grievance "unfounded" after consulting with the Sex Offender Services Management Team. *See* Aff. of Jeffrey Dillman ¶ 9 (May 24, 2022), ECF No. 24-2. He explained that, although Jones's images might "technically" depict adults, "they appear to be underage and some are sexual in nature and therefore have been determined to

15

be detrimental to [Jones's] treatment and recovery." *Id.* (quoting Dillman Aff. Ex., ECF No. 24-2, at 20). He also noted that Jones could still order photos that adhered to his IRP and that Jones should "make sure that any photos are clearly and unquestionably adult subjects." *See id.* (quoting Dillman Aff. Ex., ECF No. 24-2, at 20).

### III. Discussion

Jones's First Amendment claim raises a "facial" challenge to his IRP as written by Boyd and an "as applied" challenge to Harrell's decision to confiscate his entire image collection on grounds that all the images violated the IRP's terms. *See* Defs.' Br. in Supp. 10, 17. Defendants argue that they are entitled to summary judgment on this claim because Jones "has not carried his burden of disproving the validity of these restrictions" under *Turner* and its progeny. *Id.* at 17; *see Stolle*, 319 F. Supp. 3d at 838 (noting that *Turner* applies to both "facial" and "as applied" First Amendment challenges). They also point to specific evidence in the record demonstrating that, in light of *Turner*'s deferential standard of review, each Defendant reasonably exercised her professional judgment in this case. *See generally* Defs.' Br. in Supp. 2–9 (citing Harrell Aff. ¶¶ 1, 6; Boyd Aff. ¶¶ 1, 8, 10, 15, 18, 29–30; Stransky Aff. ¶¶ 4–5, 14–15, 18; Boyd Suppl. Aff. ¶¶ 8, 10–11; Harrell Suppl. Aff. ¶¶ 5–6, 9–10; Harrell Suppl. Aff. Encl. B); *id.* at 13–15 (citing Boyd Aff. ¶ 29; Boyd Suppl. Aff. ¶ 8; Stransky Aff. ¶¶ 12, 18); *accord Beard*, 548 U.S. at 525, 533–34 (holding that prison officials were entitled to summary judgment on prisoner's First Amendment claim challenging Policy that banned all publications in long-term segregation unit where the officials presented uncontested evidence and statements of material fact "sufficient to demonstrate that the Policy is a reasonable one" and the prisoner "failed to set forth 'specific facts' that, in light of the deference that courts must show to the prison officials, could warrant a determination in his favor" (quoting Fed. R. Civ. P. 56(e))). Thus, unless Jones "can point to

sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard*, 548 U.S. at 530 (plurality op.). He has not done so. Indeed, Jones did not respond specifically to Defendants' properly supported Statement of Undisputed Facts at all. *See* Pl.'s Br. in Opp'n 1–5. Accordingly, I consider those facts to be undisputed for purposes of this motion. Fed. R. Civ. P. 56(e)(2).

A.    *Defendant Boyd is entitled to summary judgment*

The IRP that Boyd drafted for Jones prohibits him from accessing any material, publication, or photo that the Psychology Associate determines meets any one of four criteria: (1) it violates VDOC policy because it depicts nudity, sexually explicit acts, or sexual acts that violate state or federal law, including child pornography; (2) it "may be detrimental to" Jones's IRP, or it "may or could promote sexually deviant behaviors"; (3) it depicts "any male who appears to be under the age of 18, or is purposefully attempting to appear to be under the age of 18"; or (4) it "featur[es] males touching themselves or each other in manner that is perceived as sexual in nature, including, but not limited to, touching the genital area, breasts, or buttock of themselves or others." Stansky Aff. Encl. B, ECF No. 51-1, at 16; *see* Harrell Suppl. Aff. ¶ 8 (summarizing the same four categories).

The first *Turner* factor asks "whether there is a valid, rational connection between" these restrictions "and the interest asserted by the government, or whether this interest is so remote as to render the [IRP] arbitrary or irrational." *Shell v. Boyd*, No. 7:18cv333, 2020 WL 5579559, at *5 (quoting *Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006) (other quotation marks omitted)). Boyd attests that she based the IRP's restrictions on her knowledge that Jones is a convicted sex offender who victimized underage males, the fact that Jones had ordered or received more than 50 photos of nude and semi-nude individuals who appeared to be minor males, Jones's

admission that he used these photos for sexual fantasies, and her clinical judgment concerning Jones's rehabilitative needs. Boyd Aff. ¶¶ 11–12, 14–15, 20, 29; Boyd Suppl. Aff. ¶¶ 4, 7–8, 10–11. Defendants' affidavits set out several justifications for the IRP's restrictions, including Boyd's clinical judgment about Jones's rehabilitation needs, reducing sexual harassment in the prison setting, and monitoring risk generally. *See* Boyd Suppl. Aff. ¶ 11; Stransky Aff. ¶¶ 12, 14, 17–18. The first justification is legally sufficient. *Cf. Beard*, 548 U.S. at 530 ("We need go no further than the first justification, that of providing increased incentives for better prison behavior.").

Boyd explains that "[a]voiding possession of items that could trigger sexual fantasies and sexual arousal . . . is critical to [Jones's] sex offender treatment and rehabilitation" because "it removes potential 'triggers' that could lead to recidivist behaviors." Boyd Suppl. Aff. ¶ 11. Sex-offender rehabilitation is a legitimate penological interest. *Ballance*, 130 F. Supp. 2d at 760 (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *Shell*, 2020 WL 5579559, at *6 (citing *McKune v. Lile*, 536 U.S. 24, 37–38 (2002) (plurality op.)). "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Shell*, 2020 WL 5579559, at *6 (quoting *McKune*, 536 U.S. at 33). Thus, VDOC officials have a legitimate interest in rehabilitating Jones in order to protect the public from future harm. *Id.* The fact that Jones is effectively serving multiple life sentences, Stransky Aff. ¶ 4, does not undermine VDOC's interest in rehabilitating him. *See, e.g.*, *Ballance v. Zook*, No. 1:19cv330, 2021 WL 3130864, at *3–4 (E.D. Va. July 23, 2021) (concluding that VDOC had a legitimate interest in rehabilitating a convicted sex offender who was "serving multiple life sentences for several counts of forcible sodomy, aggravated sexual battery, abducing, and taking indecent liberties with a child").

Moreover, the record demonstrates that Boyd tailored this IRP's restrictions "to the nature of Jones'[s] crimes and the nature of his victims—males, and especially[] underage males" with rehabilitative interests in mind. Boyd Suppl. Aff. ¶ 11; *see also* Boyd Aff. ¶¶ 12, 20, 29–30, 32; Harrell Aff. ¶ 12; Boyd Suppl. Aff. ¶¶ 8–11; Stransky Aff. ¶¶ 11–12, 14–15, 17–18. Director Stransky attests that Boyd's plan is

> appropriate from a rehabilitative perspective. The accumulation of over 100 sexually explicit images by a convicted violent sex offender—who admittedly was using them to gratify his sexual fantasies—is contrary to the overall goal of monitoring and reducing risk in convicted sex offenders. This is true regardless of whether the individuals depicted in the suggestive photographs are under the age of 18, or are adults.

Stransky Aff. ¶ 18. "These statements point to evidence—namely, the views of [two treatment providers]—that the regulations do, in fact, serve the function identified." *Cf. Beard*, 548 U.S. at 531 (plurality op.) (noting that "the views of the deputy superintendent," which he expressed during his deposition and prisoner did not contest, provided sufficient evidence that the Policy was logically related to government's legitimate interest in encouraging better behavior). Jones did not refute this evidence. Fed. R. Civ. P. 56(e). Accordingly, he failed to show that the IRP's restrictions are "not rationally related to the state's legitimate interests in rehabilitating [him] as a sex offender," *Shell*, 2020 WL 5579559, at *7. *See, e.g.*, *id.* at *2, *7–8 & n.6 (convicted sex offender failed to show that his IRP's prohibition on possessing "photos which may be detrimental to the treatment plan or that may promote sexually deviant behaviors[,] . . . . includ[ing] materials and photos of [his] victim(s)," was "not rationally related to the state's legitimate interests in rehabilitating [him] as a sex offender").

The second *Turner* factor asks if Jones's IRP leaves him with other ways to exercise his First Amendment right to receive speech while incarcerated. *Id.* at *7. There is no dispute that it does. Defs.' Br. in Supp. ¶¶ 19, 29, 36; Stransky Aff. ¶ 14; Boyd Suppl. Aff. ¶ 11; Harrell Suppl.

Aff. ¶¶ 9–10. The IRP merely limits Jones's ability to view or possess materials that a qualified professional has determined are related to his sex crimes against underage males. *Cf. Shell* 2020 WL 5579559, at *7 (concluding that Shell's IRP left him "ample opportunities to receive and share ideas, information, and even photographs" because it "merely curtails his ability to possess written materials or images related to his victim or his crimes"). He can still receive and share a wide range of ideas, information, and publications. *Id.* He can even have non-nude images of men who do not "appear[] to be under the age of 18, or [are] purposefully attempting to appear to be under the age of 18" and who are not "touching themselves or each other in manner that is perceived as sexual in nature," Stransky Aff. Encl. B, ECF No. 51-1, at 16. *See* Defs.' Br. in Supp. ¶¶ 19, 29, 36; *cf. Shell*, 2020 WL 5579559, at *7 (noting that Shell could still "subscribe to publications . . . about any topics not prohibited by his treatment plan"). Jones can also "consult with [the Psychology Associate] about what items are and are not consistent with the plan's restrictions[] before he suffers any adverse consequences," *Shell*, 2020 WL 5579559, at *7. *See* Stransky Aff. Encl. B, ECF No. 51-1, at 16–17.

The third *Turner* factor requires the Court to evaluate how permitting Jones to access the materials barred by his IRP would impact VDOC's interest in rehabilitating him. *Shell*, 2020 WL 5579559, at *8. Boyd explains that "[a]llowing unfettered access to sexually explicit materials— particularly materials that have an evident connection to the inmate's underlying crimes—can exacerbate the sex offender's recidivist tendencies and is detrimental to [his or her] overall rehabilitation and treatment." Boyd Suppl. Aff. ¶ 8. At their meeting, Jones told Boyd that he used pictures of young men for sexual fantasies. Defs.' Br. in Supp. ¶ 23 (citing Boyd Aff. ¶ 15). "Avoiding possession of items that could trigger sexual fantasies and sexual arousal in these areas is critical to his sex offender treatment and rehabilitation, as it removes potential 'triggers'

that could lead to recidivist behaviors." Boyd Suppl. Aff. ¶ 11. Thus, allowing Jones to access the prohibited images "would have an adverse impact" on VDOC's efforts to rehabilitate him. *See Shell*, 2020 WL 5579559, at *8.

Finally, the fourth *Turner* factor requires Jones to present an "obvious, easy alternative means" of addressing VDOC's rehabilitative interest "to the same extent" that his IRP does. *Shell*, 2020 WL 5579559, at *8; *see Overton*, 539 U.S. at 136 ("*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alterative that fully accommodates the [constitutional] right asserted while not imposing more than a *de minimis* cost to the valid penological goal."). Jones does not propose any alternatives. He believes he should be allowed to have "seductive" images of young men because, in his mind, those images have "nothing to do with [his] crimes." Compl. 4. As noted, however, Defendants presented uncontradicted evidence that Boyd found the banned materials are related to Jones's crimes against underage males and that, based on her clinical training and the information available to her, eliminating Jones's access to those materials "is critical to his sex offender treatment and rehabilitation." Boyd Suppl. Aff. ¶ 11; *cf. Shell*, 2020 WL 5579559, at *8 ("While [Shell] obviously believes no such treatment is necessary in this case, VDOC staff must judge his rehabilitation needs [based] on his criminal record, the evidence from his case, and his present willingness to work toward compliance with the treatment plan.").

Boyd carried her initial burden to show the absence of a genuinely disputed material fact and that, under *Turner* and its progeny, she is entitled to judgment as a matter of law on Jones's First Amendment claim. *See Beard*, 548 U.S. at 525, 529–30. Despite having the opportunity to do so, Jones failed to set out any specific fact that, in light of the deference this Court must give to Boyd's professional judgment, "could warrant a determination in his favor." *Id.* at 525 (citing

21

*Overton*, 539 U.S. at 132; Fed. R. Civ. P. 56(e)). Accordingly, the Court will grant Boyd's motion for summary judgment. Fed. R. Civ. P. 56(a).

B.    *Defendant Harrell is entitled to summary judgment*

Defendants' affidavits and supporting documents demonstrate that the restrictions in Jones's IRP are reasonably related to VDOC's legitimate interest in rehabilitating him. *Shell*, 2020 WL 5579559, at *8. Jones's remaining § 1983 claim asks whether Harrell's decision to enforce the IRP by confiscating Jones's entire collection of photographs and thumbnail images was reasonably related to furthering that interest. Compl. 4–5, 8, 11–12; *cf. Shell*, 2020 WL 5579559 at *6, *8–9 (examining Boyd's "enforcement" decision to confiscate specific photos and a *Vogue* magazine with one image depicting sexual bondage from Shell based on Boyd's finding that the materials were inconsistent with his valid IRP); *Ballance*, 130 F. Supp. 2d at 760 (examining officer's decision to confiscate Ballance's collection of 406 children's photos, based on officer's knowledge that Ballance was "a convicted pedophile," even though only "a small percentage" of the photos actually depicted "nude or partially nude children" in violation of VDOC policy). I find that Defendants have adequately supported their position that Harrell's decision was reasonable under *Turner* and its progeny and that Jones has not pointed to any specific facts in the record that could persuade a reasonable jury to find in his favor. *See Beard*, 548 U.S. at 525, 529, 534 (citing Fed. R. Civ. P. 56(e)).

The following facts are undisputed: Jones is convicted sex offender. Harrell Aff. ¶¶ 12–13. Harrell knew that Jones committed sex "crimes against underage male victims; that is why his IRP is specific to publications of underage males or publications of males acting in sexual manner." *Id.* ¶ 12; *see Shell*, 2020 WL 5579559 *6 (noting Boyd's knowledge that Shell's sex "crimes involved bondage and [that Boyd] had found him to be somewhat obsessed with his

victim" when creating his IRP); *cf. Ballance*, 130 F. Supp. 2d at 760 (noting the undisputed facts

that "Ballance is a convicted pedophile" and that "Rowlett was aware of Ballance's convictions"

when he confiscated 406 photos of children). Harrell knew that Jones was allowed to possess

"materials that do not fall within the scope of his IRP and that are otherwise allowed under

VDOC policies," and that his new IRP did not give her "unfettered discretion to confiscate any

and all materials" from him. *See* Harrell Suppl. Aff. ¶¶ 9–10. Harrell "was guided by the [IRP's]

express language and terms" when evaluating the 119 photos and 57 pages of thumbnail images.

*Id.* ¶ 8; *see Shell*, 2020 WL 5579559 *6, *8–9. Additionally, she knew that Jones used the photos

"for sexual fantasies." Defs.' Br. in Supp. ¶ 23; *cf. Shell*, 2020 WL 5579559, at *8–9 (concluding

that Boyd reasonably relied on Shell's "comments and the contents of the [confiscated] photos"

when determining that he was fixated on his "crimes to a degree not consistent with successful

rehabilitation and treatment"). She also knew that the thumbnail pages found in Jones's cell had

titles like "Erotic," "Semi-Nude," and "Twink." Defs.' Br. in Supp. ¶ 37; *see generally* Harrell

Suppl. Aff. Encl. B. Jones's collection contained "more Twink than others." Compl. Attach. 1,

ECF No. 1-1, at 18; *accord* Harrell Suppl. Aff. Encl. B (Twink vols. 2, 4, 6–8, 10).

     After reviewing the materials, Harrell determined that they "did not comply with the

terms of Jones's IRP." Harrell Suppl. Aff. ¶ 6; *cf. Shell*, 2020 WL 5579559, at *7 n.5 (noting that

Shell did not dispute that the materials Boyd confiscated were in fact related to his victim, his

crimes, or "sexual bondage," all of which were barred by the terms of his valid IRP). Based on

that determination, she confiscated all 119 photos and 57 thumbnail pages. *See* Harrell Suppl.

Aff. ¶ 6; *cf. Shell*, 2020 WL 5579559, at *7 & n.5 (deferring to Boyd's decision to seize entire

*Vogue* magazine from Shell based on a single advertisement featuring sexual bondage in part

because Shell did not deny "that the ad depicted sexual bondage, albeit in a playful manner");

*Ballance*, 130 F. Supp. 2d at 758–60 (deferring to Rowlette's informed judgment that the presence of some "nude and partially nude photographs mixed in with other children's pictures render[ed] all [406] pictures of children contraband" under VDOC policy). "The confiscated photographs all depict boys or young men in varying states of undress, some with exposed pubic hair or buttocks, and generally posed in a sexually suggestive manner." Defs.' Br. in Supp. ¶ 38. Although Jones insists that the models "looked over 18" to him, Compl. 5, he does not dispute Harrell's statement that they all appeared to be "underage males" and/or males of any age "acting in a sexual manner," Harrell Aff. ¶ 12. *See* Compl. 4–5; *cf. Shell*, 2020 WL 5579559, at *8–9 (noting that Shell did not dispute Boyd's description of 17 photos confiscated under the terms of his valid IRP).

These facts compel the conclusion that Harrell's informed decision to confiscate Jones's entire image collection was reasonably related to VDOC's legitimate interest in ensuring that Jones, a convicted sex offender who targeted underage males, cannot access materials that might undermine his rehabilitation or trigger recidivist behaviors. *See Shell*, 2020 WL 5579559, at *6–9; *Ballance*, 130 F. Supp. 2d at 760. Harrell therefore carried her initial burden to show the absence of a genuinely disputed material fact and that, under *Turner* and its progeny, she is entitled to judgment as a matter of law on Jones's First Amendment claim. *See Beard*, 548 U.S. at 525, 529–30. Despite having the opportunity to do so, Jones failed to set out any specific fact that, in light of the deference this Court must give to Harrell's professional judgment, "could warrant a determination in his favor." *Id.* at 525 (citing *Overton*, 539 U.S. at 132; Fed. R. Civ. P. 56(e)). Accordingly, the Court will grant Harrell's motion for summary judgment.[9] Fed. R. Civ. P. 56(a).

---

[9] Harrell and Boyd also seek summary judgment based on qualified immunity. Defs.' Br. in Supp. 18–19. Here, the Court "determined that [Jones] has not shown facts 'to make out a violation of a constitutional right'" against either

IV. Conclusion

For the foregoing reasons, Defendants' supplemental motion for summary judgment, ECF No. 50, will be **GRANTED** and this case will be dismissed in its entirety. A separate judgment order shall enter.

ENTER: September 23, 2025

Joel C. Hoppe
U.S. Magistrate Judge

---

Defendant on the merits, so "no further analysis is needed." *Fauconier*, 257 F. Supp. 3d at 763 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).